IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PAMELA LADD, o/b/o J.J.L.G., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. 13-00088-B |
| | * | |
| CAROLYN W. COLVIN, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Plaintiff, Pamela Ladd ("Plaintiff"), brings this action on behalf of her minor child, J.J.L.G.,[1] seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*. On October 29, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 16). Thus, this case was referred to the undersigned to conduct all proceedings through entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 18). Oral argument was waived. Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED.**

### I. Procedural History

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her son J.J.L.G. on September 22, 2008. (Tr. 135). Plaintiff alleges that J.J.L.G. has been disabled since January 2, 2002, due to attention deficit hyperactivity disorder ("ADHD").

---

[1] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, the Court has redacted the minor child's name throughout this opinion and refers to him only by his initials.

1

(Id. at 135, 139). Plaintiff's application was denied at the initial stage on February 23, 2009. (Id. at 63). Plaintiff filed a timely Request for Hearing, and on May 17, 2010, Administrative Law Judge Ben E. Sheely (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff, her son J.J.L.G., and Plaintiff's attorney. (Id. at 47). On June 7, 2010, the ALJ issued an unfavorable decision finding that J.J.L.G. is not disabled. (Id. at 19). Plaintiff's request for review was denied by the Appeals Council on August 25, 2011. (Id. at 4). Because the Appeals Council failed to notify Plaintiff of its decision, it granted Plaintiff an extension of time in which to file a civil action. (Id. at 1).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. Issues on Appeal

A. Whether the ALJ erred in failing to address the Teacher Questionnaire completed by J.J.L.G.'s teacher, Robin Montgomery?

B. Whether the ALJ failed to properly analyze the credibility of claimant's mother?

## III. Factual Background

Born on November 14, 1997, J.J.L.G. was twelve years old at the time of his May 17, 2010, administrative hearing and was in the fifth grade at Holloway Elementary School. (Tr. at 50, 52, 116). The record reflects that J.J.L.G. has been diagnosed with attention-deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. (Id. at 50, 339).

At the hearing, J.J.L.G.'s mother, Ms. Ladd, testified that J.J.L.G. has no physical ailments. (Id. at 52). He does chores; he likes to go to the Boys and Girls Club; and he is responsible for taking out the trash. (Id. at 57, 60). Ms. Ladd testified that J.J.L.G. was held back in the first grade but that he is in regular classes at school, with some EIP help from special

2

education. (Id. at 52). She testified that his grades are "[n]ot good" and that he has gone from making A's and B's at the beginning of the school year to making D's and E's. (Id. at 53). Ms. Ladd testified that J.J.L.G.'s fifth grade teacher, Ms. Montgomery, reported that he is not focused in the classroom and that he likes to play. (Id. at 53, 57). Ms. Ladd likewise testified that "[w]hen [J.J.L.G.] gets out of school, he just wants to play[;] he does not want to focus on school work." (Id. at 57).

At the time of the hearing, J.J.L.G. was going to Alta Pointe Health Systems for counseling and for medication for his ADHD. (Id. at 54). His medications at that time consisted of Vyvanse, Fluoxetine (Prozac), Clonidine, and DDAVP (for bed wetting). (Id. at 59-60). Ms. Ladd testified that the medications were not helping his hyperactivity, although they had just recently increased the dosage. (Id. at 54). She also testified that J.J.L.G. had started stealing money from her and from his grandmother. (Id. at 54, 58-59).

## IV. Analysis

### A. Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[2] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991);

---

[2] This Court's review of the Commissioner's application of legal principles is plenary. See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

3

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

### B. Childhood Disability Law

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996. See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c). The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(i), 20 C.F.R. § 416.906.[3] The regulations provide a three-step sequential evaluation process for determining childhood disability claims. 20 C.F.R. § 416.924(a).

At step one, a child's age and work activity, if any, are identified to determine if he has engaged in substantial gainful activity. At step two, the child's physical/mental impairments are

---

[3] On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18. See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001, and apply to Plaintiff's claim. See 65 Fed. Reg. at 54,751.

examined to see if he has an impairment or combination of impairments that is severe. Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meets or is medically or functionally equal to an impairment listed in Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement.[4] 20 CFR § 416.924.

A child's impairment(s) meets the listings' limitations if he actually suffers from limitations specified in the listings for his severe impairment. Shinn v. Commissioner of Soc. Sec., 391 F.3d 1276, 1279 (11th Cir. 2004). A child's impairment(s) medically equals the listings if his limitations are at least of equal severity and duration to the listed impairment(s). Id. (citing 20 CFR § 416.926). Where a child's impairment or combination of impairments does not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations that functionally equal the listings.[5] 20 CFR § 416.926a. To establish functional equivalence in step three, the claimant must have a medically determinable impairment or combination of impairments that results in marked limitations in two functional domains or an extreme limitation in one domain. 20 CFR § 416.926a(a). The six domains are: (1) acquiring and using information; (2) attending and

---

[4] In making this determination the ALJ considers the combined effect of all medically determinable impairments, even those that are not severe. See 20 CFR 416.923, 416.924a(b)(4), and 416.926a(a) and (c).

[5] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining, and non-examining medical sources, and the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration. 20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 CFR 416.926a.

C. **Discussion**

1. **ALJ's Decision**

In this action, the ALJ issued an unfavorable decision on June 7, 2010. (Tr. 19). After setting forth the sequential evaluation process for evaluating child disability claims, the ALJ determined that J.J.L.G has not engaged in substantial gainful activity and that, while he has the severe impairments of attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder, they do not meet, medically equal, or functionally equal the criteria for any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Id. at 22).

With respect to the functional equivalence domains, the ALJ found that J.J.L.G. has "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (Id. at 36-41). The ALJ further found that J.J.L.G. has no limitation in the domains of moving about and manipulating objects and health and physical well-being. (Id.). Accordingly, the ALJ concluded that, because J.J.L.G. does not meet or medically equal any of listings set forth in 20 CFR Part 404, Subpart P, Appendix 1, nor does he functionally equal the listings by having an impairment or combination of impairments that results in either "marked"[6] limitations in two domains of functioning or "extreme" limitation in one domain of functioning, he is not disabled under the

---

[6] Social Security regulation 20 CFR 416.926a(e)(2) explains that a child has a "marked limitation" in a domain when his impairment(s) "interferes seriously" with his ability to independently initiate, sustain, or complete activities. It means "more than moderate" but "less than extreme." Id. By way of contrast, an "extreme" limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities." 20 CFR 416.926a(e)(3). It is the rating given to the "worst limitations." Id.

Act. (Id. at 42).

2. Record Evidence

a. Academic Evidence

In 2004, at the age of six, J.J.L.G. was diagnosed with ADHD, combined type, and adjustment disorder with anxiety and placed on medication. (Id. at 251, 256). At the time that Plaintiff filed her application for disability benefits on September 22, 2008, on behalf of J.J.L.G., he was ten years old and in the fourth grade at Holloway Elementary School. (Id. at 147). J.J.L.G. was in regular classes and had no problem with absenteeism. His fourth grade teacher, Ms. Cleveland, noted that he was performing below his grade level in reading, math, and writing. (Id.). In a teacher questionnaire completed by Ms. Cleveland on October 13, 2008, she noted that J.J.L.G. "has to be told several times to get on task to complete assignments;" "[h]e is slow in completing assignments or even preparing for his day;" he has a problem with daydreaming and focus; and that he was suspended for fighting. (Id. at 148-50). In rating J.J.L.G's abilities in the six domains of functioning, Ms. Cleveland found, for the most part, that J.J.L.G had "serious problems" in three areas of functioning, and "slight," "obvious," or "no problems" in all other areas of functioning. She also opined that J.J.L.G had no "very serious problems" in any area of functioning. (Id. at 148-153).

On March 9, 2009, Ms. Cleveland, completed a second teacher questionnaire regarding J.J.L.G.'s abilities. At that time, Ms. Cleveland again noted that he was performing below grade level, that he seemed to be preoccupied easily, that he was often off task, that he had to be reminded constantly to stay focused, and that he was slow in completing his work. (Id. at 177-84). In rating his abilities in the six domains of functioning, Ms. Cleveland again opined that J.J.L.G had no "very serious" problems in any area of functioning, and that his only "serious"

7

problem in functioning related to "expressing ideas in written form". (Id. at 178). In all other areas of functioning, Ms. Cleveland opined that J.J.L.G. had "slight," "obvious," or "no problem[s]" at all. (Id. at 177-84).

On May 11, 2009, at his mother's request, J.J.L.G. was tested using the Weschsler Non-Verbal Scale of Ability (WNV) test and the Woodcock Johnson Tests of Achievement Third Edition (WJIII). (Id. at 365-69). He obtained a Full Scale IQ score of 85 (low average range) on the WNV and a Total Achievement Score of 71 on the WJIII (average score is between 90 and 110). (Id.). As a result of the testing, it was determined that J.J.L.G. had a specific learning disability. (Id. at 199). The results showed that he was reading on a third grade level but that he was "holding his own" in math. (Id. at 200). In response, the school developed a plan to give J.J.L.G accommodations including peer tutoring, shortened answer choices, shortened assignments, study guide with specific items to study, and extra time to complete assignments. In the plan, it was noted that J.J.L.G was expected to "receive a regular grade in the area of reading, language, and math." (Id.).

In the fall of of 2009, J.J.L.G. began the fifth grade. On April 9, 2010, his fifth grade teacher, Ms. Montgomery, completed a teacher questionnaire regarding his abilities. At that time, Ms. Montgomery noted that J.J.L.G. was reading and writing on grade level but that his math was below average. (Id. at 223). She also noted that he had problems getting started and completing assignments, that he was occasionally sent to other classrooms for outbursts, that his medication did not seem to work because he was constantly distracted and moving, that he had potential but lacked the self-discipline and focus to move forward, that he believed "it [wa]s okay to lie and deceive" adults and his classmates, and that he acted "as if he [were] an infant, always needing assistance." (Id. at 224-30). In rating his abilities in the six domains of

functioning, Ms. Montgomery opined that he had nine "very serious" problems (spanning the domains of attending and completing tasks, interacting and relating with others, and caring for oneself), and nineteen "serious" problems (spanning the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, and caring for oneself). (Id.).

In addition, J.J.L.G.'s Report Card in March 2010 reflected fifth grade/first quarter grades of B (Language Arts), D (Reading), D (Math), B (Science), and B (Social Studies); second quarter grades of D (Language Arts), C (Reading), D (Math), B (Science), and an E in Social Studies; and third quarter grades of D (Language Arts), D (Reading), D (Math), C (Science), and C (Social Studies).[7] (Id. at 211). His report card also included comments by his teacher, Ms. Montgomery, noting "incomplete classwork," "does not assume responsibility," and "does not exercise self-control." (Id.). The report card did not reflect any absences from school during the period in question. (Id.). At the time of the hearing on May 17, 2010, J.J.L.G.'s mother testified that it was unclear whether he would promoted to the sixth grade. (Id. at 57).

### b. Medical Evidence

The relevant medical evidence of record shows that J.J.L.G. began receiving treatment at Mobile Mental Health Center for ADHD, adjustment disorder with anxiety, and disruptive behavior disorder in 2004 when he was six years old. (Id. at 251, 256, 261). J.J.L.G.'s treatment records from Mobile Mental Health Center in December 2005 show that he was taking Clonidine and Metadate CD (for ADHD) and DDAVP for bedwetting and experiencing no negative side

---

[7] J.J.L.G.'s mother, Ms. Ladd, testified at the hearing that at the beginning of his fifth grade year, J.J.L.G. had been making A's and B's, but that, as time progressed, his grades dropped to D's and E's. (Tr. at 53). She noted that his Dad died the previous year, on March 17, 2009. (Id. at 54).

9

effects. (Id. at 267). The records also show that his behavior was "much better" following a previous suspension from school, and his concentration and grades were "good." (Id.).

J.J.L.G. continued his treatment at Mobile Mental Health Center in 2006. His treatment records at that time show that he was taking Concerta and Clonidine for ADHD and DDAVP for bedwetting, and his mother reported that he was doing well academically. (Id. at 287-88). In July 2006, Plaintiff also began treatment at Altapointe Health Systems ("Altapointe"), where he was diagnosed with ADHD, combined type. (Id. at 336). In December 2006, Mobile Mental Health Center prepared an assessment reflecting that J.J.L.G. continued to have problems with anger, frustration, fighting, not following rules, not sitting still, and bed wetting. (Id. at 282, 285-86). His mother reported a history of two school suspensions for disrupting class and stated that he had failed the first grade. (Id. at 285).

In April 2007, J.J.L.G.'s records from Mobile Mental Health Center show that he was "doing well at school." (Id. at 280-81). His records from Altapointe in October 2007 also reflect that he was "doing well," that he was following directions at school, that he was not getting out of his seat, that he had A's and B's on his report card, and that his mother was having no problems with him. (Id. at 305).

In February 2008, J.J.L.G.'s treatment records from Altapointe show that he made "A honor roll," and his mother reported that she was not having any problems with him. (Id. at 304). By April 2008, however, J.J.L.G. was having problems related to his mother's live-in boyfriend and sadness over not having his brother live in the home any longer. (Id. at 302). J.J.L.G. also reported that his grades were dropping. (Id.). From July to November 2008, J.J.L.G. continued

to have problems with his brother being away from home,[8] and his mother reported that he was not focused at school, that he was taking too long to do his work, that he was getting in trouble at school, that he had a smart mouth, that he did not want to help at home, that he "gets in everybody's business," and that he was still wetting the bed. (Id. at 297-300, 326).

Plaintiff filed her application for childhood disability benefits on September 22, 2008. (Id. at 135). In October 2008, J.J.L.G.'s treatment notes from Altapointe reflect that the therapist changed his ADHD medication from Concerta to Vyvance after his mother reported that Concerta was making him aggressive. (Id. at 327). In December 2008, his treatment notes indicate that he was "responding well to Vyvanse" and concentrating better at school. (Id. at 324-25). His mother reported that he "did excellent on his CRT's." (Id.).

In January 2009, J.J.L.G.'s records from Altapointe reflect that his concentration and attention were improved at school. However, at home, he was being "very oppositional" toward his mother. (Id. at 320-22).

On February 13, 2009, Dr. Lucile T. Williams, Psy.D., conducted a consultative mental examination for the Agency. (Id. at 338). At that time, J.J.L.G. was eleven years old and in the fourth grade in at Holloway Elementary School. (Id.). Dr. Williams noted that J.J.L.G. was in regular classes at school but that his relationships with his teacher and peers were "not good." (Id.). Dr. Williams found that J.J.L.G. was age-appropriate with most of his activities of daily living, and his mental status examination was largely normal and appropriate, except that his insight and understanding of himself were limited, and his judgment was poor. (Id. at 338-39). His estimated intelligence was average. (Id. at 339). His activities of daily living included going

---

[8] In November 2008, J.J.L.G. told his therapist at Altapointe that he missed his brother and that his brother had moved out of the home because of dislike for his mother's boyfriend. (Tr. 326).

11

outside, playing video games, doing chores, going to church, playing with friends, riding his bike, and watching television. (Id.). Dr. Williams diagnosed J.J.L.G. with ADHD and oppositional defiant disorder. (Id.). With respect to J.J.L.G.'s prognosis, Dr. Williams stated, "[i]t is likely that … he will have a favorable response as treatment continues." (Id.).

On February 23, 2009, State Agency psychological consultant, Dr. Hope Jackson, Ph.D., reviewed J.J.L.G.'s school and treatment records and completed a childhood disability evaluation form. Dr. Jackson opined that even with his impairments of ADHD and oppositional defiant disorder, J.J.L.G. has "less than marked" limitations or "no limitation" in the six domains of functioning. (Id. at 340-45).

In March 2009, J.J.L.G.'s records from Altapointe reflect that he was "doing good." (Id. at 346). The following month, his therapist noted that J.J.L.G.'s father had died. (Id. at 359). In May 2009, J.J.L.G.'s mother reported that the school had tested him and determined that he was learning disabled. (Id. at 357). In June 2009, J.J.L.G.'s therapist noted that his attention and concentration were improved on Vyvanse and Prozac, that his mother reported that he was "doing great," that he had no aggressive behavior, and that he had passed to the fifth grade. (Id. at 356). In September 2009, the therapist recommended a "bereavement camp" for J.J.L.G., but his mother reported that he was playing football and did not want to miss his game. (Id. at 349, 364). His mother reported that he acted "pouty" when he had to leave the Boys and Girls Club and was never ready to leave. (Id. at 364). In October and November 2009, J.J.L.G.'s treatment notes show that he taking his medication daily, that he was "doing well" in school, that he was expected to have a good report card, that his brother was helping him with his daily needs, and that his mother had reported that "all ha[d] been well," and she had not had any problems with him at home or at school. (Id. at 363, 410-11). In December 2009, J.J.L.G.'s treatment notes

reflect that his mother reported on December 1, 2009, that he was doing well at home and at school, but upon receiving his progress report later in the month, she reported that his grades had dropped to D's and E's because, according to his teacher, Ms. Montgomery, he was not turning in his assignments. (Id. at 404-05).

In February 2010, J.J.L.G.'s treatment notes from Altapointe show that he was making "great improvements," "doing well," exhibiting good manners, playing well with others, needing no redirection, and showing respect to his peers and adults. (Id. at 396-98). He had also pulled his grades up to two B's, two C's, and a D. (Id. at 397). In addition, his teacher, Ms. Montgomery, reported to his case manager that he was doing well and keeping up with his assignments and home work. (Id. at 394). J.J.L.G.'s case manager encouraged him to continue to work hard. (Id. at 397). However, by the end of February 2010, J.J.L.G.'s case manager noted that he was making "very little" progress, stating that his teacher, Ms. Montgomery, had reported that she was concerned that he may fail the fifth grade. Ms. Montgomery told the case manager that J.J.L.G. "is capable of doing his work," but he "doesn't do it until he is pressured." (Id. at 392). Ms. Montgomery further stated that J.J.L.G. "has great abilities to read and comprehend but refuses to do so." (Id.). The case manager had met with J.J.L.G. the previous day and noted that he was "very respectful and well mannered," that he interacted with both peers and adults, that he followed directions, and that he "seem[ed] to have enjoyed himself." (Id. at 391).

In March 2010, J.J.L.G.'s treatment notes from Altapointe reflect that the case manager met with his mother and that the mother was "in crisis" because J.J.L.G. had been "hanging with an undesired crowd," stealing large amounts of money from her, playing dangerously with fire, and not completing his assignments in school. (Id. at 385-89). She also reported that he did well on his CRT's, but his report card was poor. (Id. at 389). His treatment notes further reflect that a

drug test was being requested by Altapointe before J.J.L.G.'s prescriptions would be refilled. (Id. at 378-79).

In April 2010, J.J.L.G. underwent further evaluation at Altapointe by Dr. Laura Goulden, Ph.D., and testing yielded a Full Scale IQ score of 73 on the WISC-IV. (Id. at 415-16). Dr. Goulden diagnosed J.J.L.G. with depressive disorder, NOS, ADHD, combined (by history), and learning disorder, NOS (by history), rule out borderline intellectual functioning. (Id.). She recommended continued treatment for his symptoms and continued academic accommodations. (Id.).

### 3. Issues

    **a. Whether the ALJ erred in failing to address the Teacher Questionnaire completed by J.J.L.G.'s teacher, Robin Montgomery?**

In her brief, Plaintiff argues that the ALJ erred in disregarding the teacher questionnaire prepared by J.J.L.G.'s fifth grade teacher, Robin Montgomery, on April 9, 2010, in which Ms. Montgomery opined that J.J.L.G. had "very serious" problems in nine functional areas (involving three domains) and "serious" problems in nineteen functional areas (involving four domains). (Doc. 11 at 4). Plaintiff maintains that the ALJ was required to consider that report when assessing J.J.L.G.'s limitations and that his failure to do so constitutes reversible error. (Id. at 4-5).

In its response, Defendant acknowledges that the ALJ did not address Ms. Montgomery's teacher questionnaire and that under the regulations, the observations of other non-medical sources, such as teachers, are important when evaluating a child's disability claim. (Doc. 13 at 7, 10). Defendant argues, however, that the ALJ considered other statements made by Ms. Montgomery, as well as other teacher reports, J.J.L.G.'s mother's statements, J.J.L.G.'s

psychological treatment records, and the opinions of examining psychologist Dr. Williams and non-examining psychologist Dr. Jackson in determining that J.J.L.G.'s condition did not meet, medically equal, or functional equal the listings. (Id. at 7-8). Based upon a careful review of the record, the undersigned finds that the ALJ did not appropriately consider Ms. Montgomery's opinions set forth in the teacher questionnaire prepared on April 9, 2010, and that his failure to do so was error and warrants remand.

The Social Security regulations and rulings require that an ALJ "consider all relevant evidence in the case record," and this includes opinion evidence from other non-medical sources. SSR 06-03p, 2006 SSR LEXIS 5, 2006 WL 2329939, *4. When evaluating children's disability claims, teachers, as well as other non-medical personnel who are able to observe and interact with a child on a daily basis, are valuable resources in determining the severity of a child's impairment and how a child typically functions compared to other children his age. 20 C.F.R. § 416.913(d). "Social Security Ruling 06-03p, which addresses evidence from non-medical sources, provides that, where the non-medical source has seen the claimant in his or her professional capacity, the evaluation of that evidence is fact-specific, considering the nature and extent of the relationship between the source and claimant, the source's qualifications and expertise, the extent to which the source provides relevant evidence to support his or her opinion, and the consistency of that opinion with other evidence." Reed v. Astrue, 2009 U.S. Dist. LEXIS 99357, *7-8, 2009 WL 3571699, *2 (S.D. Ala. October 26, 2009) (unreported) (internal quotation marks omitted). "Under certain circumstances, the opinion of such a source may be entitled to greater weight than a medical source, even a treating source." Id.

"While an ALJ is not required to discuss every piece of evidence on the record, he must nonetheless 'develop a full and fair record,' which, at least, means that his opinion must describe

15

his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard. Id., 2009 U.S. Dist. LEXIS 99357 at *8-9 (citing Newsome v. Barnhart, 444 F. Supp. 2d 1195, 1198 n.2 (M.D. Ala. 2006) (citing Ogranaja v. Commissioner of Soc. Sec., 186 Fed. App'x 848, 851 (11th Cir. 2006) ("We do not require the ALJ to 'specifically refer to every piece of evidence in his decision,' so long as the decision is sufficient to allow us to conclude that the ALJ considered the claimants' medical condition as a whole.")). Moreover, "[t]here is no requirement in the Social Security regulations or rulings that the ALJ assign any weight to non-medical sources"; however, the ALJ is required to consider the non-medical source evidence. Reed, 2009 U.S. Dist. LEXIS 99357, *11-12, 2009 WL 3571699, at *3-4.

In this case, the ALJ determined that although J.J.L.G. suffered from ADHD and oppositional defiant disorder, which constituted "severe" impairments, those impairments did not meet, medically equal, or functionally equal the listings. (Tr. at 20, 22). Therefore, J.J.L.G. was not disabled. The ALJ's detailed findings in support of his determination are set forth in his decision; thus, will not be reiterated here. (Id. at 22-42). His findings of fact address much of the evidence in significant detail, including J.J.L.G.'s treatment records from Mobile Mental Health Center and Altapointe, medical evidence from examining and non-examining psychologists, the testimony of the claimant's mother, and some of J.J.L.G.'s school records. (Id.). Based on this evidence, the ALJ concluded that J.J.L.G. has no limitations in the domains of moving about and manipulating objects and health and physical well-being and "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (Id. at 36-41).

16

As Plaintiff points out, in reaching his decision, the ALJ relied heavily on a teacher questionnaire completed by J.J.L.G.'s fourth grade teacher, Ms. Cleveland, on October 13, 2008.[9] (Id. at 24, 35-41). Yet, the ALJ failed altogether to mention or discuss the subsequent teacher questionnaire completed by J.J.L.G.'s fifth grade teacher, Ms. Montgomery, in which she expressed very serious concerns about J.J.L.G.'s functional abilities, and further failed to address evidence that during his fifth grade year, J.J.L.G.'s grades took a nose-dive, and it was not at all clear that he would be promoted to the next grade. As noted *supra*, in April 2010, which was near the end of J.J.L.G.'s fifth grade year, Ms. Montgomery opined that J.J.L.G. had "serious" problems in *nineteen* functional areas and "very serious" problems in *nine* areas. (Id. at 224-30). To be specific, Ms. Montgomery opined that J.J.L.G. had "very serious" problems with completing class and homework assignments, working at a reasonable pace and finishing on time, respecting and obeying adults, and cooperating in taking needed medications. (Id. at 149-52, 225-28). She also opined that J.J.L.G. had problems getting started and completing assignments, that he was occasionally sent to other classrooms for outbursts, that his medication did not seem to work because he was constantly distracted and moving, that he had potential but lacked the self-discipline and focus to move forward, that he believed it was "okay to lie and deceive" adults and his classmates, and that he acted "as if he [were] an infant, always needing assistance." (Id. at 223-30).

---

[9] The record contains three teacher questionnaires, two completed by J.J.L.G.'s fourth grade teacher, Ms. Cleveland, and a third completed by J.J.L.G.'s fifth grade teacher, Ms. Montgomery. (Tr. 147, 177, 223). Although the ALJ did not identify by date or author the teacher questionnaire to which he repeatedly referred and upon which he relied for all but one of his domain findings, a review of the information described therein reveals that it was Ms. Cleveland's 2008 teacher questionnaire. (Tr. 35-41, 147).

While Defendant correctly points out that the ALJ referenced statements made by Ms. Montgomery to J.J.L.G.'s case manager on February 26, 2010, that J.J.L.G. "is capable of doing his work but doesn't do it until he is pressured" and that he "has great abilities to read and comprehend but refuses to do so" (id. at 34, 392), the ALJ failed to acknowledge, much less reconcile, the inconsistencies between those statements and Ms. Montgomery opinions, set forth in her subsequent teacher questionnaire, that J.J.L.G. had "serious" problems in nineteen functional areas and "very serious" problems in nine areas, and that it was not clear that he would be promoted to the next grade. (Id. at 34).

Moreover, while the ALJ assigned "significant evidentiary weight" to the February 2009 opinion of non-examining psychologist Dr. Jackson that J.J.L.G. had either "less than marked" or no limitations in each of the six domains of functioning, Dr. Jackson's 2009 assessment predated Ms. Montgomery's 2010 teacher questionnaire and was based, instead, on Dr. Jackson's review of Ms. Cleveland's 2008 fourth grade teacher questionnaire. (Id. at 35, 342-43). There is no indication in the ALJ's decision that he considered or reconciled the inconsistencies between Dr. Jackson's assessment, Ms. Montgomery's subsequent opinions, and J.J.L.G.'s school records, which reflect that his grades took a nose dive in the fifth grade and that he was on the verge of being held back.

As discussed above, the ALJ is not required to specifically refer to every piece of evidence in his decision as long as the decision is sufficient to allow the Court to conclude that the ALJ considered the claimant's medical condition as a whole. Cox v. Astrue, 2012 U.S. Dist. LEXIS 44958, *29, 2012 WL 1094443, *9 (S.D. Ala. March 30, 2012). Indeed, "findings may be by implication if they are 'obvious to the reviewing court.'" Carter v. Astrue, 228 Fed. App'x 967, 969 (11th Cir. 2007) (unreported). In this case, despite the ALJ's assertion that he

considered all of the relevant evidence in the case record, it is far from clear, for the reasons set forth above, that the ALJ appropriately considered the "other source" evidence provided by J.J.L.G.'s fifth grade teacher, Ms. Montgomery on April 9, 2010, only two months before the ALJ's decision. Therefore, remand is warranted.

Because the Court determines that the decision of the Commissioner should be reversed and remanded for further proceedings based on the preceding claim, there is no need for the Court to address Plaintiff's remaining claim. See Porter v. Astrue, 2012 U.S. Dist. LEXIS 140217, *18 n.7, 2012 WL 4497568, *6 n.7 (S.D. Ala. September 28, 2012) (unreported) (citations omitted).

## V. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for child supplemental security income, be **REVERSED** and **REMANDED.**

**DONE** this **25th** day of **March, 2014.**

                                                /s/ SONJA F. BIVINS
                                                **UNITED STATES MAGISTRATE JUDGE**